JOHN T. JASNOCH (CA Bar No. 281605)
jjasnoch@scott-scott.com
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508

*Counsel for Plaintiffs Lauren Marie Barbiero,*
*Kimberly Jo Lopez, and William Kenneth Lopez*

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAUREN MARIE BARBIERO, KIMBERLY JO LOPEZ, and WILLIAM KENNETH LOPEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARLES SCHWAB INVESTMENT ADVISORY, INC.,<br><br>Defendant. | Case No.: _____<br><br>CLASS ACTION<br><br><br>**CLASS ACTION COMPLAINT** |

COMPLAINT

NOW COME Plaintiffs Lauren Marie Barbiero, Kimberly Jo Lopez, and William Kenneth Lopez ("Plaintiffs"), individually and on behalf of all others similarly situated, and allege as follows:

## **INTRODUCTION**

1.     This class action concerns self-dealing by Charles Schwab Investment Advisory, Inc. ("CSIA"), a wholly owned subsidiary of one of America's largest retail investment advisors, The Charles Schwab Corporation ("Schwab").[1]

### ***Schwab's "Intelligent Portfolios"***

2.     Schwab and its affiliates manage about $54 billion worth of investments for retail stock market investors through a so-called "robo-advisor" investment-advice program called Schwab Intelligent Portfolios ("Intelligent Portfolios" or "SIP Program"), which Schwab launched in 2015.[2]

3.     A robo-advisor is a digital investment advisor designed to provide financial advice or manage investments with moderate to minimal human intervention.[3]  Robo-advisors employ algorithms to understand and predict investor preferences, risks and goals.[4]

4.     When first signing up with a robo-advisor, an investor typically responds to a questionnaire that is used to establish a so-called "investor profile," or a summary of his or her risk tolerance, investing time frame, financial situation, and financial goals.  To further help select appropriate investments for a particular investor, comprehensive robo-advisors also typically look for more in-depth investor information using artificial intelligence tools and available data.  In

---

[1]     Through its operating subsidiaries, Schwab provides a full range of wealth management, securities brokerage, banking, asset management, custody, and financial advisory services.  With over $6.69 trillion in total client assets, it is one of the largest broker-dealers in the United States.

[2]     According to the March 31, 2021 Disclosure Brochure for the SIP Program ("2021 Disclosure Brochure"), attached hereto as Exhibit 1, Schwab and/or its affiliates managed $53,743,435,281 of assets for the SIP Program as of December 31, 2020.

[3]     *See* Milan Ganatra, *What is a Robo-Advisor And How Does It Work?* FORBES (June 7, 2021), https://www.forbes.com/advisor/in/investing/what-is-a-robo-advisor-and-how-does-it-work/.

[4]     *See id.*

particular, they use a given investor's financial transactions including investment, bank, and credit card transactions to understand the actual financial behavior of that investor.[5]

5.      Once the investor has completed the questionnaire and provided other requested information that the system can analyze, the robo-advisor program constructs an investment portfolio for the investor based on all the available information – usually from a selection of exchange-traded funds ("ETFs") and similar investments.  In this way, a robo-advisor like Schwab's SIP Program attempts to create an asset allocation for the investor who uses it that matches the general principles of investing for those who have similar characteristics to the instant investor.

6.      The use of the robo-advisor programs by every-day investors has been on the rise. "In a world where automation has entered every sphere of life, robo-advisors are emerging as a choice to manage wealth."[6]  Robo-advisory services have been compared to "the Uber of the professional investment advisory world, eliminating the intermediate role and thus reducing fees for the end user."[7]

7.      As a result of the exploding popularity of robo-advisors, the marketplace for such programs has become highly lucrative and competitive, with more and more investment firms introducing their proprietary robo-advisor products.  As recently reported, "[r]obo-advisers, which typically select low-cost exchange traded funds for investors based on their risk tolerance and automatically rebalance the portfolios, have become increasingly popular across Wall Street, with Goldman Sachs Group Inc. rolling out such a product earlier this year."[8]  In particular, "Schwab predicts assets managed by robo-advisers will grow to $460 billion next year, from $47.3 billion in 2015."[9]

---

[5]      *See id.*

[6]      *Id.*

[7]      Alexander Volkov, *Why Robo-Advisors Are Becoming Popular?* FINTECH WEEKLY (Nov. 5, 2017), https://fintechweekly.com/magazine/articles/why-robo-advisors-are-becoming-popular.

[8]      Brian Cappatta and Benjamin Bain, *Schwab Taking $200 Million Charge For SEC Robo-Adviser Probe,* Bloomberg.com (July 2, 2021).

[9]      *Id.*

COMPLAINT

*Schwab's Cash Sweeps in the "Intelligent Portfolios" Program*

8.      Almost all robo-advisors charge investment advisory fees to the investors who use them.  Depending on the robo-advisor involved, a robo-advised investor might pay an annual fee based on his or her account balance, or they may instead pay a flat monthly fee.

9.      By way of illustration, the average fee charged by robo-advisors, based on an account balance of $50,000, was 0.36% per year, or about $180.[10]

10.      Schwab's "Intelligent Portfolios" robo-advisor charges its associated fees differently than competing robo-advisors, however.  The fee regime for the SIP Program is explained on Schwab's website as follows:

- **Backed by our commitment to keeping costs low.**

- Pay no advisory fee and no commissions.

- Invest in a portfolio of low-cost exchanged-traded funds Tooltip (ETFs).

- Just as if you'd invested on your own, you will pay the operating expenses on the ETFs in your portfolio, which includes Schwab ETFs™.[11]

11.      Schwab's website notes the following also, almost in passing:

- **What else you should know.**

- We believe cash is a key component of an investment portfolio.  ***Based on your risk profile, a portion of your portfolio is placed in an FDIC-insured deposit at Schwab Bank***.  Some cash alternatives outside of the program pay a higher yield.  *See* more information.[12]

12.      As one industry commentator put it when Schwab launched "Intelligent Portfolios," the "devil truly is in the details" when it comes to Schwab's fees here.[13]

_____

[10]      *See* Miranda Marquit, *What is a Robo-Advisor?* MAGNIFYMONEY (July 17, 2020), https://www.magnifymoney.com/blog/investing/what-is-a-robo-advisor/.

[11]      https://www.schwab.com/intelligent-portfolios (last viewed Aug. 23, 2021).

[12]      *Id*. (emphasis added).

[13]      Adam Nash, *Broken Values & Bottom Lines* (March 9, 2015), https://medium.com/@adamnash/broken-values-bottom-lines-3d550a27629.

COMPLAINT

13.     While Schwab indeed charges its retail investor clients no investment advisory fees in connection with the SIP Program, the program is not free for anyone to use, as certain Program marketing suggests.

***How Schwab Profited off Plaintiffs Using the "Intelligent Portfolios" Cash Sweeps***

14.     In fact, Schwab makes money off of its SIP Program investors like Plaintiffs here in at least two ways.

15.     As a Raymond James analyst report put it in February 2015:

> **Two revenue streams from Schwab Intelligent Portfolios (SIP)**: Although the product itself is free (no advisory fee, no commissions, no service fees), SIP will generate revenue for Schwab in two ways.  ***First***, some portion of client portfolios may be invested in Schwab ETFs, from which Schwab will earn management fees.  ***Second, Schwab will sweep the cash allocation of client managed accounts into Schwab Bank and earn a net interest margin on this cash***.  We believe the second revenue source is likely to be much greater than the first and Schwab's regulatory filings indicate the same.  . . .[14]

16.     This lawsuit concerns the second of those revenue streams Schwab has enjoyed from the SIP Program – which, again, is unique among robo-advisors in this market segment.  No other retail investment advisor offers a robo-advisor program that charges fees this way.

17.     And why are Plaintiffs and the proposed Class charged undeclared fees through the SIP Program by means of the cash sweeps arrangement?  Raymond James puts it this way:

> ***We now understand why Charles Schwab is so excited about the upcoming launch of Schwab Intelligent Portfolios (SIP)***, the firm's "robo-advisor" offering that is slated to launch at some point in 1Q15: SIP will allocate between 7% and 30% of client portfolios to cash.  By holding such a large percentage of managed account assets in cash that can be swept to its bank, ***Schwab stands ready to generate substantial revenue from the product despite not charging any advisory fees.  From the client's perspective, however, the potential performance drag from such a high cash allocation may easily exceed the management fee savings relative to competitors.***[15]

18.     Since its launch of "Intelligent Portfolios," Schwab has made **at least hundreds of millions of dollars** in skimming earned interest (a.k.a., "cash sweeps") away from linked cash

---

[14]     Raymond James, *The Charles Schwab Corporation* (Feb. 18, 2015), https://blog.wealthfront.com/wp-content/uploads/2015/06/Raymond-James-Schwab-Intelligent-Portfolios.pdf   (emphasis added).

[15]     *Id*. (emphasis added).

accounts of Schwab's "Intelligent Portfolios" retail investors held at Charles Schwab Bank, SSB ("Schwab Bank").[16]

***CSIA Kept Plaintiffs' "Intelligent Portfolios" Accounts Overconcentrated in Cash Positions so that Schwab Could Maximize Its Cash Sweeps Income – and This Caused Plaintiffs and the Proposed Class More than Half a Billion Dollars in Damages***

19.     In order to generate this bumper crop of cash sweeps income for itself and its corporate parent, Schwab, CSIA systematically kept the "Intelligent Portfolios" accounts of Plaintiffs and the proposed Class over-concentrated in cash during the white-hot boom years of America's recent stock market.  This caused Plaintiffs and the proposed Class foreseeably to miss out on market gains they would have enjoyed had CSIA instead managed their "Intelligent Portfolios" accounts loyally and prudently and without CSIA placing its own interests and those of Schwab before the interests of its clients, as it has done here.

20.     CSIA's self-dealing directly caused Plaintiffs and the proposed Class more than half a billion dollars in losses here:  "based on a simulated portfolio return using the equity-only and fixed income-only returns of its Schwab Intelligent Portfolio account, which is invested in a moderately aggressive portfolio, Backend Benchmarking is reporting that for the six-year period ending June 30, [2021,] *clients with Schwab Intelligent Portfolios missed out on $531 million in portfolio growth [that they would have earned] if Schwab had [instead] charged a 0.30% management fee and invested the cash into the same fixed-income assets that are held in the portfolio*."[17]

21.     Schwab has disclosed to the U.S. Securities and Exchange Commission ("SEC") how the "cash sweeps" feature of "Intelligent Portfolios" works as follows:

> Each investment strategy [offered through the Schwab "Intelligent Portfolios" program] involves the Sweep Allocation to the Sweep Program.  The Sweep Allocation will generally range from 6% to 30% of an account's value to be held in cash, depending on the investment strategy the client selects based on the client's risk tolerance and time horizon. ***The Sweep Program is a feature of the Program that clients cannot eliminate.***  The deposit balances at Schwab Bank will not be used to

---

[16]     *See* Nicole Casperson, *How much does Schwab's cash sweep really cost clients?* INVESTMENTNEWS (Aug. 12, 2021), https://www.investmentnews.com/schwab-cash-sweep-costing-clients-210170.

[17]     *Id*. (emphasis added).

purchase securities for a client's account unless those balances exceed the Sweep Allocation for the selected investment strategy.[18]

22.     The February 20, 2015 Disclosure Brochure for the SIP Program ("2015 Disclosure Brochure"), attached hereto as Exhibit 2, acknowledges that the "cash sweeps" feature of the "Intelligent Portfolios" can create a conflict of interest:

> Schwab Bank earns income on the Sweep Allocation for each investment strategy. The higher the Sweep Allocation and the lower the interest rate paid the more Schwab Bank earns, thereby creating a potential conflict of interest.  The cash allocation can affect both the risk profile and performance of a portfolio.

*Id.*

***CSIA Violated Fiduciary Duties It Owes to Plaintiffs and the Class by Wrongfully Overconcentrating Plaintiffs' "Intelligent Portfolios" Accounts in Cash Positions***

23.     Exactly that conflict of interest is now before this Court.

24.     Even though CSIA is an acknowledged fiduciary[19] to the SIP Program investors, CSIA systematically has violated its fiduciary and other legal duties here by placing its interests and those of Schwab before the interests of Plaintiffs and the proposed Class, by over-concentrating Plaintiffs' SIP Program accounts in cash relative to other assets.[20]

---

[18]     Adam Nash, *supra* n.13 (emphasis added).

[19]     *See* Lisa Shidler, *Schwab spills robo-beans to Wall Street, including a Schwab Bank wrinkle, cannibalization rates and the algorithm's distaste for OneSource funds*, BIARiz (Feb. 12, 2015), https://riabiz.com/a/2015/2/12/schwab-spills-robo-beans-to-wall-street-including-a-schwab-bank-wrinkle-cannibalization-rates-and-the-algorithms-distaste-for-onesource-funds (Terri Kallsen of Schwab stating to industry media that "Schwab Intelligent Portfolios is a great example of driving down costs while increasing transparency" – adding, "***This is a fiduciary account***.  We want people to look at this account and say how does this fit my needs better.  People get it." (emphasis added).). Schwab's 2015 Disclosure Brochure for its part provides that Defendant CSIA here "is the sole fiduciary, as defined under the Internal Revenue Code, in performing investment management services and exercising discretion over the assets managed in any retirement account" in the "Intelligent Portfolios" program.

[20]     *See* Bloomberg News, *As robos have become increasingly popular, their automated investing choices have come under greater scrutiny* (July 5, 2021), https://www.investmentnews.com/schwabs-200-million-charge-puts-focus-on-robo-advisers-208484 ("David Goldstone, manager of research and analytics at Backend Benchmarking, which ranks robo-advisors, says the Schwab robo-advisor holds too much of its clients' funds in cash.").

25.     CSIA caused the assets of Plaintiffs and the proposed Class held in the SIP Program to be over-allocated to cash in order to maximize Schwab's income from the so-called "Sweep Program" that is part of the "Intelligent Portfolios" platform.  CSIA did this at the expense of Plaintiffs and the proposed Class here.  Because CSIA did this, Plaintiffs and the proposed Class paid hundreds of millions of dollars in unwarranted and unfair cash sweeps to Schwab and collectively missed out on over $500 million in portfolio growth since the inception of the SIP Program.

***Schwab Sets Aside $200 Million to Resolve SEC Investigation Concerning Schwab's "Intelligent Portfolios" Disclosures to Plaintiffs and Other "Intelligent Portfolios" Investors***

26.     Schwab reported in early July 2021 that it took a charge of $200 million in the second quarter of 2021 pertaining to, in Schwab's words, an ongoing probe by the SEC that "largely concerns historic disclosures" relating to the SIP Program[21] – in other words, to the very disclosures that are before the Court now in this case, since the history of the "Intelligent Portfolios" is only six years long (among other things) and the disclosures cited here are the official disclosures for Schwab's SIP program.

27.     Schwab said it would not provide any further details about the SEC's "Intelligent Portfolios" investigation beyond those included in the aforementioned securities filing, and the SEC has declined to comment on it otherwise.

28.     Industry observers, however, have managed to read these tea leaves.  "Schwab's $200 Million Charge Points Toward Conflicts with Cash Spreads," declares the headline of one recent article about the $200 million accounting charge that Schwab has taken relating to the SEC's "Intelligent Portfolios" investigation.[22]

---

[21]     *See* Schwab's Form 8-K, dated July 1, 2021.

[22]     Sean Alloca, *Schwab's $200 million charge points toward conflicts with cash spreads*, INVESTMENTNEWS (July 21, 2021), https://www.investmentnews.com/schwabs-200-million-charge-points-toward-conflicts-with-cash-spreads-209106 ('"[Is the SEC charge] a comeuppance for Schwab, after years of marketing its "free" no-advisory fee robo, where clients were then placed into Schwab ETFs and Schwab cash?' asked Michael Kitces, in a tweet this month.  '***Ironically, it's hard to imagine what else it could be that adds up to a $200 million adjustment for Schwab.  That's a huge write down***.'") (Emphasis added.)

29.     Similarly, another article put it this way: "'For $200 million . . . it must have been something that the SEC perceives as egregious[.]'"[23]

30.     In short, CSIA has breached the fiduciary and other legal duties it owed Plaintiffs and the proposed Class; CSIA's wrongful conduct here proximately caused Plaintiffs and the proposed Class financial damages; and CSIA should be held liable accordingly.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), 18 U.S.C. §1964 (a) and (c), and the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because Plaintiffs are of diverse citizenship from Defendant and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs.

32.     Venue is proper here pursuant to 28 U.S.C. §1391 because among other things, CSIA is based in this District; its parent, Schwab, maintains a nationwide presence, including in this District; and a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### *Plaintiffs*

33.     Plaintiff Lauren Marie Barbiero ("Barbiero") is a resident of Terrytown, Louisiana. She opened an "Intelligent Portfolios" account with Schwab in March of 2019 and closed it in March of 2020.  During the time that Plaintiff Barbiero maintained her "Intelligent Portfolios" account with Schwab, upon information and belief, CSIA caused her "Intelligent Portfolios" account to maintain excessive and unwarranted cash positions in order not to advance Plaintiff's investing goals, but instead to enrich itself and its corporate parent, Schwab, unjustly as alleged herein.

34.     Plaintiff Kimberly Jo Lopez ("Lopez") is a resident of Walden, New York.  She opened an "Intelligent Portfolios" account with Schwab in April of 2019, which she still maintains.

---

[23]     Lisa Shidler, *Schwab sings 'Blue' as it rolls out its robo – and phono – functions ahead of deadline, with minimums*, RIABiz (March 9, 2015), https://riabiz.com/a/2015/3/9/schwab-sings-blue-as-it-rolls-out-its-robo-and-phono-functions-ahead-of-deadline-with-minimums (quoting Ari Sonneberg, partner and chief marketing officer for the Wagner Law Group in Boston).

During the time that Plaintiff Lopez has maintained her "Intelligent Portfolios" account with Schwab, upon information and belief, CSIA caused her "Intelligent Portfolios" account to maintain excessive and unwarranted cash positions in order not to advance Plaintiff's investing goals, but instead to enrich itself and its corporate parent, Schwab, unjustly as alleged herein.

35.    Plaintiff William Kenneth Lopez ("W. Lopez") is a resident of Walden, New York. He opened an "Intelligent Portfolios" account with Schwab in October of 2020, which he still maintains.   During the time that Plaintiff W. Lopez has maintained his "Intelligent Portfolios" account with Schwab, upon information and belief, CSIA caused his "Intelligent Portfolios" account to maintain excessive and unwarranted cash positions in order not to advance Plaintiff's investing goals, but instead to enrich itself and its corporate parent, Schwab, unjustly as alleged herein.

***Defendant***

36.    Defendant CSIA is based in San Francisco, California, and has been registered as an investment adviser since November 5, 2009.  In particular, CSIA offers portfolio management, investment strategies, retirement planning, trading, research, and other financial services.  According to the 2021 Disclosure Brochure, CSIA provides portfolio management services for the SIP Program accounts and directs trades in the accounts of Plaintiffs and the proposed Class.  As noted above, according to the 2015 Disclosure Brochure, CSIA, among other things, "is the sole fiduciary, as defined under the Internal Revenue Code, in performing investment management services and exercising discretion over the assets managed in any retirement account" in the SIP Program.

## PLAINTIFFS' "INTELLIGENT PORTFOLIOS" ACCOUNTS

37.    According to the 2021 Disclosure Brochure, the SIP Program is offered online through an interactive website and mobile application (collectively, the "Website").  Participants in the SIP Program such as Plaintiffs and the Class, are given access to the Website and answer questions from an online questionnaire to set up their investor profile and determine their level of investment risk tolerance.  *See id.*  The SIP Program then creates a client portfolio composed of

1  certain ETFs[24] as well as a cash allocation that is purportedly based on the client's stated investment

2  objectives and risk tolerance and presents that portfolio to the client for his or her use.  *See id*.  The

3  SIP Program is meant to monitor a given client's portfolio on a daily basis and is further supposed to

4  rebalance as needed to ensure the client's portfolio remains consistent with their selected risk profile

5  at all times.  *See id*.

6          38.     Plaintiff Barbiero maintained an SIP Program account from March of 2019 through

7  March of 2020.  During this period, CSIA kept Plaintiff Barbiero imprudently and excessively

8  invested in cash positions as alleged herein in order to benefit itself and its corporate parent, Schwab,

9  at the expense of Plaintiff Barbiero and the proposed Class.  Contrary to the premise of the SIP

10  Program, Plaintiff Barbiero's imprudent and excessive cash allocation in her SIP Program account

11  was inconsistent with, *inter alia*, her investment objectives, financial situation, and investment risk

12  tolerance, which was known to CSIA.

13          39.     Among other things, Plaintiff Barbiero's SIP Program account with Schwab was (and

14  CSIA knew this)[25] to be used for saving for Plaintiff's minor son, who is, and at all times pertinent to

15  this case was, under the age of 21.  It is a basic principle of investment portfolio construction that

16  when, as here, "investors have a longer investment horizon, they can take on more risk, since the

17  market has many years to recover in the event of a pullback."[26]  This principle is recognized by

18  Schwab, which informs its current and potential clients on its company website that "[h]istorically,

19  the longer you invest, the less impact the short-term ups and downs of the market have on your

20  return."[27]  As such, "an investor with an investment horizon of 30 years would typically have most

21  of their assets allocated to equities."[28]

22

23  [24]     The portfolio of ETFs includes up to 20 asset classes across stocks, fixed income real estate, and commodities.

24  [25]     Plaintiff Barbiero's account statements indicate that it is a custodial account for her son,

25  Dominic L. Barbiero "until age 21".

26  [26]     James Chen, *Investment Horizon*, (Oct.16, 2020), https://www.investopedia.com/terms/i/investment_horizon.asp.

27  [27]     *Investing Basics: FAQs*, https://www.schwab.com/how-to-invest/investing-basics.

28  [28]     Chen, *supra*, n.26.

40. Despite the extensive investment horizon associated with Plaintiff Barbiero's SIP Program account, CSIA kept Plaintiff Barbiero's Schwab account invested in approximately 10% or more in cash. This, under these circumstances, is an imprudently high cash allocation for a savings account of a beneficiary/client like Plaintiff Barbiero's son, who is under 21 years of age. As recognized in the industry, "[t]he low returns that bank savings accounts and CDs offer make unsuitable investment for long-term portfolios, because the potential for growth becomes more important than the need for immediate capital preservation."[29] Furthermore, "[g]iven the compounding of returns, even small differences can lead to very large differences in the potential outcomes for asset values over time."[30]

41. The following chart indicates Plaintiff Barbiero's monthly cash allocation during the time she maintained her SIP Program account:

**Balance by Month**

| Month | Cash Amount | % in Cash |
|---|---|---|
| March 2019 | $ | 9% |
| April 2019 | $ | 9% |
| May 2019 | $ | 10% |
| June 2019 | $ | 9% |
| July 2019 | $ | 10% |
| August 2019 | $ | 10% |
| September 2019 | $ | 10% |
| October 2019 | $ | 11% |
| November 2019 | $ | 10% |
| December 2019 | $ | 11% |
| January 2020 | $ | 11% |
| February 2020 | $ | 10% |

42. By way of example, had Plaintiff Barbiero's assets that were imprudently held in cash, instead been invested in other investment alternatives that were available at the time, Plaintiff

---

[29] *How Does Time Horizon Affect Your Investing?*, THE MOTLEY FOOL (June 29, 2016), https://www.fool.com/knowledge-center/how-does-time-horizon-affect-your-investing.aspx.

[30] FCLTGlobal, Balancing Act: Managing Risk Across Multiple Time Horizons (Dec. 21, 2018), https://www.fcltglobal.org/resource/balancing-act-managing-risk-across-multiple-time-horizons/.

Barbiero would have made the following investment gains on a quarterly basis from Q1 2019 through Q1 2020:

| Q1 2019 through Q1 2020 | Performance/Interest Rate | Earnings Difference |
|---|---|---|
| | | |
| **Q1 2019 Balance in Schwab Bank Savings Sweep** | $█ | |
| DOW Jones | 11.15% | $█ |
| S&P 500 Index | 13.07% | $█ |
| NASDAQ | 16.49% | $█ |
| Schwab Bank Savings | 0.70% | $█ |
| | | |
| **Q2 2019 Balance in Schwab Bank Savings Sweep** | $█ | |
| DOW Jones | 14.03% | $█ |
| S&P 500 Index | 17.35% | $█ |
| NASDAQ | 20.66% | $█ |
| Schwab Bank Savings | 0.67% | $█ |
| | | |
| **Q3 2019 Balance in Schwab Bank Savings Sweep** | $█ | |
| DOW Jones | 15.39% | $█ |
| S&P 500 Index | 18.74% | $█ |
| NASDAQ | 20.56% | $█ |
| Schwab Bank Savings | 0.61% | $█ |
| | | |
| **Q4 2019 Balance in Schwab Bank Savings Sweep** | $█ | |
| DOW Jones | 24.43% | $█ |
| S&P 500 Index | 31.22% | $█ |
| NASDAQ | 39.39% | $█ |
| Schwab Bank Savings | 0.30% | $█ |
| | | |
| **Q1 2020 Balance in Schwab Bank Savings Sweep** | $█ | |
| DOW Jones | -21.50% | ($█) |
| S&P 500 Index | -18.40% | ($█) |
| NASDAQ | -12.60% | ($█) |
| Schwab Bank Savings | 0.30% | $█ |
| | | |

| Total Potential Earnings | Total Earnings | Mgt Fee | Cost | Earnings after fees |
|---|---|---|---|---|
| DOW Jones | $█ | 0.30% | $1.83 | $█ |
| S&P 500 Index | $█ | 0.30% | $2.27 | $█ |

| | | | | |
|---|---|---|---|---|
| NASDAQ | $ ███ | 0.30% | $2.75 | $ ███ |
| Schwab Bank Savings Sweep | $ ██ | | | $ ██ |
| | | | | |

43.     Plaintiff Lopez has maintained an SIP Program account since April of 2019 through the present.  During this period, CSIA kept Plaintiff Lopez imprudently and excessively invested in cash positions as alleged herein in order to benefit itself and its corporate parent, Schwab, at the expense of Plaintiff Lopez and the proposed Class.  Contrary to the premise of the SIP Program, Plaintiff Lopez' imprudent and excessive cash allocation in her SIP Program account was inconsistent with, *inter alia*, her investment objectives, financial situation, and investment risk tolerance, which was known to CSIA.

44.     The following chart indicates Plaintiff Lopez' monthly cash allocation during the time she maintained her SIP Program account:

**Balance by Month**

| Month | Cash Amount | % in Cash |
|---|---|---|
| May 2019 | $ ███ | 9% |
| June 2019 | $ ███ | 10% |
| July 2019 | $ ███ | 9% |
| August 2019 | $ ███ | 9% |
| September 2019 | $ ███ | 9% |
| October 2019 | $ ███ | 9% |
| November 2019 | $ ███ | 9% |
| December 2019 | $ ███ | 10% |
| January 2020 | $ ███ | 9% |
| February 2020 | $ ███ | 13% |
| March 2020 | $ ███ | 12% |
| April 2020 | $ ███ | 12% |
| May 2020 | $ ███ | 11% |
| June 2020 | $ ███ | 13% |
| July 2020 | $ ███ | 12% |
| August 2020 | $ ███ | 11% |
| September 2020 | $ ███ | 12% |
| October 2020 | $ ███ | 12% |
| November 2020 | $ ███ | 11% |
| December 2020 | $ ███ | 11% |
| January 2021 | $ ███ | 11% |
| February 2021 | $ ███ | 11% |
| March 2021 | $ ███ | 11% |
| April 2021 | $ ███ | 12% |

13

| May 2021 | $ ███ | 12% |
| June 2021 | $ ███ | 25% |
| July 2021 | $ ███ | 12% |

45.    By way of example, had Plaintiff Lopez' assets that were imprudently held in cash, instead been invested in other investment alternatives that were available at the time, Plaintiff Lopez would have made the following investment gains on a quarterly basis from Q2 2019 through Q2 2021:

| Q2 2019 through Q2 2021 | | |
|---|---|---|
| | **Performance/Interest Rate** | **Earnings Difference** |
| **Q2 2019 Balance in Schwab Bank Savings Sweep** | $ ███ | |
| DOW Jones | 14.03% | $ ███ |
| S&P 500 Index | 17.35% | $ ███ |
| NASDAQ | 20.66% | $ ███ |
| Schwab Bank Savings | 0.67% | $ ███ |
| | | |
| **Q3 2019 Balance in Schwab Bank Savings Sweep** | $ ███ | |
| DOW Jones | 15.39% | $ ███ |
| S&P 500 Index | 18.74% | $ ███ |
| NASDAQ | 20.56% | $ ███ |
| Schwab Bank Savings | 0.61% | $ ███ |
| | | |
| **Q4 2019 Balance in Schwab Bank Savings Sweep** | $ ███ | |
| DOW Jones | 24.43% | $ ███ |
| S&P 500 Index | 31.22% | $ ███ |
| NASDAQ | 39.39% | $ ███ |
| Schwab Bank Savings | 0.30% | $ ███ |
| | | |
| **Q1 2020 Balance in Schwab Bank Savings Sweep** | $ ███ | |
| DOW Jones | -21.50% | ($ ███ ) |
| S&P 500 Index | -18.40% | ($ ███ ) |
| NASDAQ | -12.60% | ($ ███ ) |
| Schwab Bank Savings | 0.30% | $ ███ |
| | | |
| **Q2 2020 Balance in Schwab Bank Savings Sweep** | $ ███ | |
| DOW Jones | 2.30% | $ ███ |
| S&P 500 Index | 1.50% | $ ███ |
| NASDAQ | 1.20% | $ ███ |

14

| | | | |
|---|---|---|---|
| Schwab Bank Savings | 0.16% | | $ ■ |
| | | | |
| **Q3 2020 Balance in Schwab Bank Savings Sweep** | $ ■ | | |
| DOW Jones | 5.11% | | $ ■ |
| S&P 500 Index | 7.31% | | $ ■ |
| NASDAQ | 9.45% | | $ ■ |
| Schwab Bank Savings | 0.15% | | $ ■ |
| | | | |
| **Q4 2020 Balance in Schwab Bank Savings Sweep** | $ ■ | | |
| DOW Jones | 18.40% | | $ ■ |
| S&P 500 Index | 24.65% | | $ ■ |
| NASDAQ | 42.58% | | $ ■ |
| Schwab Bank Savings | 0.13% | | $ ■ |
| | | | |
| **Q1 2021 Balance in Schwab Bank Savings Sweep** | $ ■ | | |
| DOW Jones | 8.30% | $ ■ | |
| S&P 500 Index | 6.20% | $ ■ | |
| NASDAQ | 3.00% | $ ■ | |
| Schwab Bank Savings | 0.11% | $ ■ | |
| | | | |
| **Q2 2021 Balance in Schwab Bank Savings Sweep** | $ ■ | | |
| DOW Jones | 5.10% | $ ■ | |
| S&P 500 Index | 8.50% | $ ■ | |
| NASDAQ | 9.70% | $ ■ | |
| Schwab Bank Savings | 0.10% | $ ■ | |

| Total Potential Earnings | Total Earnings | Mgt Fee | Cost | Balance after fees |
|---|---|---|---|---|
| DOW Jones | $ ■ | 0.30% | $66.54 | $ ■ |
| S&P 500 Index | $ ■ | 0.30% | $92.63 | $ ■ |
| NASDAQ | $ ■ | 0.30% | $125.77 | $ ■ |
| Schwab Bank Savings | $ ■ | | | $ ■ |

46.     Plaintiff W. Lopez has maintained an SIP Program account since October of 2019 through the present.  During this period, CSIA kept Plaintiff W. Lopez imprudently and excessively invested in cash positions as alleged herein in order to benefit itself and its corporate parent, Schwab, at the expense of Plaintiff W. Lopez and the proposed Class.  Contrary to the premise of the SIP Program, Plaintiff W. Lopez' imprudent and excessive cash allocation in his SIP Program account

was inconsistent with, *inter alia*, his investment objectives, financial situation, and investment risk tolerance, which was known to CSIA.

47.     The following chart indicates Plaintiff W. Lopez' monthly cash allocation during the time he maintained his SIP Program account:

**Balance by Month**

| Month | Schwab Bank Savings Sweep Balance | % in Cash |
|-------|-----------------------------------|-----------|
| October 2020-April 2021 | $███ | 15% |
| May 2021 | $███ | 15% |
| June 2021 | $███ | 13% |
| July 2021 | $███ | 20% |

48.     By way of example, had Plaintiff W. Lopez' assets that were imprudently held in cash, instead been invested in other investment alternatives that were available at the time, Plaintiff W. Lopez would have made the following investment gains on a quarterly basis from Q4 2020 through Q2 2021.

| Q 4 2020 through Q2 2021 | Performance/Interest Rate | Earnings Difference |
|---------------------------|---------------------------|---------------------|
| **Q4 2020 Balance in Schwab Bank Savings Sweep** | $███ | |
| DOW Jones | 18.40% | $███ |
| S&P 500 Index | 24.65% | $███ |
| NASDAQ | 42.58% | $███ |
| Schwab Bank Savings | 0.13% | $██ |
| **Q1 2021 Balance in Schwab Bank Savings Sweep** | $███ | |
| DOW Jones | 8.30% | $███ |
| S&P 500 Index | 6.20% | $███ |
| NASDAQ | 3.00% | $██ |
| Schwab Bank Savings | 0.11% | $█ |
| **Q2 2021 Balance in Schwab Bank Savings Sweep** | $███ | |
| DOW Jones | 5.10% | $███ |
| S&P 500 Index | 8.50% | $███ |
| NASDAQ | 9.70% | $███ |

COMPLAINT

| Schwab Bank Savings | 0.10% | $▇ |
| --- | --- | --- |

| Total Potential Earnings | Total Earnings | Mgt Fee | Cost | Earnings after fees |
| --- | --- | --- | --- | --- |
| DOW Jones | $▇ | 0.30% | $3.27 | $▇ |
| S&P 500 Index | $▇ | 0.30% | $4.10 | $▇ |
| NASDAQ | $▇ | 0.30% | $5.70 | $▇ |
| Schwab Bank Savings | $▇ | | | |

## CLASS ALLEGATIONS

49.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs assert these claims on behalf of themselves and all other persons similarly situated.  The Class consists of the following individuals:

> All "Intelligent Portfolios" account holders during the four years preceding the filing of this Complaint and continuing until the date of trial.

50.     Plaintiffs and the Class seek to enjoin CSIA from engaging in the wrongful business practices alleged in this Complaint and to require CSIA to pay damages, make restitution and restore to the affected members of the Class all monies wrongfully obtained through its negligent and unlawful business practices.

51.     Class treatment of these claims is appropriate because the members of the Class are so numerous that joinder of all members would be impracticable.  Plaintiffs reasonably estimate that Class members number into the many thousands.  The precise number of Class members entitled to relief and their addresses are unknown to Plaintiffs but can be ascertained through appropriate discovery of Defendant's records.  Class members may be notified of the pendency of this action by electronic means, mail, publication, and/or other notice.

52.     There is a well-defined community of interest in the relevant questions of law and fact affecting putative Class members.  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

> a)     whether CSIA breached its fiduciary duties at common law by engaging in the conduct described herein;

17

b)      whether CSIA is additionally or alternatively liable for the unlawful conduct described herein pursuant to Cal. Bus. & Prof. Code §17200;

c)      the proper form of equitable and injunctive relief;

d)      the proper measure of monetary relief;

e)      whether CSIA made misrepresentations to Plaintiffs and the Class;

f)      whether CSIA breached its implied and/or expressed contracts with Plaintiffs and the Class;

g)      whether Defendant has been unjustly enriched at the expense of Plaintiffs and the Class;

h)      whether Plaintiffs and members of the Class have sustained harm;

i)      whether Plaintiffs and the Class are entitled to damages; and

j)      whether the Class is entitled to injunctive, declaratory and/or other relief.

53.     Plaintiffs' claims are typical of those of the absent Class members.  If brought and prosecuted individually, the claims of each Class member would require proof of many of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. Plaintiffs will fairly and adequately protect the interests of the Class and they have no interests adverse to, or that directly and irrevocably conflict with, the interests of other Class members. Plaintiffs are willing and prepared to serve the Court and the putative Class in a representative capacity with all of the obligations and duties attendant thereto.

54.     Plaintiffs have retained the services of counsel, identified below on the signature page, who are experienced in complex class action litigation and in particular, class actions involving investment and financial services matters.  Plaintiffs' counsel will adequately prosecute this action, and will otherwise assert, protect, and fairly and adequately represent Plaintiffs and all absent Class members.

55.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a)      individual claims by the Class members would be impracticable as the costs of pursuit would far exceed what any individual class member has at stake;

b)      very little individual litigation has been commenced over the controversies alleged in this Complaint and individual Class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

c)      the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

d)      the proposed Class is manageable.

56.    Therefore, class treatment of Plaintiffs' claims is both appropriate and necessary.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty at Common Law

57.    Plaintiffs repeat and incorporate herein the allegations of paragraphs 1-56, inclusive.

58.    As a provider of financial services and a registered investment adviser at all times relevant herein, CSIA has been a fiduciary as to Plaintiffs and the proposed Class and owes them the highest duties of loyalty and prudence in performing its financial services and acting as an investment adviser on their behalf.  As a fiduciary, CSIA has a continuing duty to act exclusively for the benefit of Plaintiffs and the proposed Class in the discharge of its investment management and advisory services.

59.    CSIA breached among others its fiduciary duties of loyalty and prudence to Plaintiffs and the proposed Class by causing Plaintiffs and the proposed Class to be too heavily invested in cash in their SIP Program accounts in contravention of *inter alia*, their investment objectives, financial situation, and investment risk tolerance.  CSIA committed these breaches in order to make more money for itself and the other Schwab defendants here at the expense of Plaintiffs and the proposed Class.

60.    CSIA's breaches of fiduciary duty directly and proximately caused Plaintiffs and the proposed Class financial losses.

19

61.     Plaintiffs seek damages to redress their financial losses, and disgorgement of any undue gains.

### SECOND CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Business & Professions Code §17200**

62.     Plaintiffs repeat and incorporate herein the allegations of paragraphs 1-61, inclusive.

63.     The UCL prohibits unfair competition, which includes an "unlawful, unfair or fraudulent" act or practice.  Cal. Bus. & Prof. Code §17200.

64.     Under the UCL, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

65.     The violation of any law constitutes an unlawful business practice under the UCL.

66.     CSIA engaged in business acts and practices deemed "unlawful" under the UCL, because, as alleged herein, CSIA violated its legal duties under fiduciary, consumer protection, and contract law here.

67.     CSIA also engaged in business acts or practices deemed "unfair" under the UCL because, as alleged above, CSIA systematically placed its interests and those of Schwab before the interests of Plaintiffs and the proposed Class and engaged in deceptive conduct and self-dealing at Plaintiffs' and the proposed Class's expense.  These acts and practices constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers and businesses, and provided no benefit to consumers or competition.

68.     By the aforementioned conduct, CSIA engaged in "unlawful, [and] unfair . . . business acts or practices" in violation of Cal. Bus. & Prof. Code §17200.  These unfair and unlawful practices occurred repeatedly in connection with CSIA's trade or business.

69.     CSIA willfully engaged in the unfair and unlawful acts and practices described above and knew or should have known that those acts and practices were unfair and unlawful in violation of the UCL.

70.     As a direct and proximate result of CSIA's unfair and unlawful practices and violation of UCL, Plaintiffs and the proposed Class have suffered and will continue to suffer substantial injury and ascertainable loss and are entitled to equitable and such other relief as this Court considers necessary and proper.

71.     Plaintiffs, individually and on behalf of the Class, seek recovery of Plaintiffs' and the Class members' economic damages.

72.     CSIA therefore is presumed to have failed to exercise due care with respect to Plaintiffs and breached the duty of reasonable care it owed Plaintiffs.

73.     CSIA's breaches of duty proximately caused harm to Plaintiffs and the proposed Class.

74.     Plaintiffs seek damages to redress their financial losses, and disgorgement of any undue gains.

### THIRD CAUSE OF ACTION

#### Negligent Misrepresentation

75.     Plaintiffs repeat and incorporate herein the allegations of paragraphs 1-74, inclusive.

76.     At all relevant times, CSIA had a duty to disclose to Plaintiffs and the proposed Class all facts material to the SIP Program, including in any promotional and disclosure materials.

77.     CSIA misrepresented to Plaintiffs and the proposed Class that the SIP Program would invest their assets in accordance with, *inter alia*, their investment objectives, financial situation, and investment risk tolerance.  *See*, *e.g.*, 2021 Disclosure Brochure (the investment portfolio offered through the SIP Program is advised to be "based on the client's stated investment objectives and risk tolerance"); *see also* 2015 Disclosure Brochure ("CSIA provides portfolio management services for Program accounts . . . consistent with clients' chosen investment strategy").

78.     In fact, CSIA caused the assets of Plaintiffs and the proposed Class in their SIP Program accounts to be imprudently over-allocated to cash for the financial benefit of CSIA and its corporate parent, Schwab, at the expense of Plaintiffs and the proposed Class.  As such, CSIA specifically and expressly misrepresented material facts to Plaintiffs and the proposed Class with regard to the SIP Program.

21

79.     CSIA had no reasonable grounds to believe that its misrepresentations concerning the SIP Program were accurate since the SIP Program, including its cash component, was at all relevant times managed by Schwab and/or its affiliates and subsidiaries, and was under these entities' exclusive control.  CSIA failed to exercise reasonable care in making these misrepresentations to Plaintiffs and the proposed Class.

80.     CSIA intended to induce Plaintiffs and the proposed Class to rely on its misrepresentations concerning "Intelligent Portfolios," so that Plaintiffs and the proposed Class would invest their moneys in the SIP Program.

81.     These misrepresentations were provided and relied upon in the context of a business transaction.  Plaintiffs and the proposed Class have been substantially harmed by Defendants' misrepresentations because had their assets been invested prudently in other available alternatives, instead of being held hostage in cash (from which they could not opt out), they would have made significantly more profits on their investments.

82.     Plaintiffs seek damages to redress their financial losses, and disgorgement of any undue gains.

### FOURTH CAUSE OF ACTION

### Breach of Contract

83.     Plaintiffs repeat and incorporate herein the allegations of paragraphs 1-82, inclusive.

84.     CSIA offered to provide portfolio management services to Plaintiffs and the proposed Class, in connection with the SIP Program, that were consistent with, *inter alia*, Plaintiffs' investment objectives, financial situation, and investment risk tolerance.

85.     CSIA's promises and obligations were set forth in, among other things, Schwab's disclosure and marketing materials disseminated by Defendants with regard to the SIP Program. *See*, *e.g.*, 2021 Disclosure Brochure (the investment portfolio offered through the SIP Program is advised to be "based on the client's stated investment objectives and risk tolerance"); *see also* 2015 Disclosure Brochure ("CSIA provides portfolio management services for Program accounts . . . consistent with clients' chosen investment strategy").

86.     Each Plaintiff and proposed Class member accepted CSIA's offer of its portfolio management services for their respective SIP Program accounts, and thereby formed an express and/or implied contract between themselves and CSIA.  A reasonable consumer would not accept investment management services unless such services were expected to be reliable.

87.     Plaintiffs and the proposed Class relied on CSIA's promises and covenants regarding its portfolio management services for the SIP Program by enrolling in the Program, opening their SIP Program investment accounts, and investing their assets in those accounts.

88.     Plaintiffs and the proposed Class performed all of their obligations under their contracts with CSIA.  They each enrolled in the SIP Program and provided to CSIA the information requested of them to participate in the Program, including filling out the pertinent questionnaires to determine their respective investment profiles that included, *inter alia*, information concerning their investment objectives and risk tolerance levels.  As such, the information concerning the investment objectives and risk tolerance levels of each Plaintiff and proposed Class members was known to CSIA during the time Plaintiffs and the proposed Class members maintained their SIP Program accounts.

89.     CSIA breached its respective contracts with Plaintiffs and the proposed Class by, *inter alia*, (1) failing to invest the assets of Plaintiffs and the proposed Class held in the SIP Program accounts in accordance with Plaintiffs' investment objectives, financial situation, and investment risk tolerance as agreed upon; (2) causing the assets of Plaintiffs and the proposed Class held in the SIP Program accounts to be imprudently over-allocated to cash for the financial benefit of itself and its corporate parent, Schwab, at the expense of Plaintiffs and the proposed Class; (3) failing to provide portfolio management services that were reliable or of the quality promised; (4) failing to ensure that the SIP Program met its own and/or reasonable quality standards; (5) not ensuring that the SIP Program services were tendered with reasonable care, including by failing to comply with applicable laws, regulations, and standards; and (6) failing to notify Plaintiffs and the proposed Class of the SIP Program's unreliability and failure to comply with its terms.

90.     Each Plaintiff and proposed Class member did not receive the benefit of their bargain, including having their assets in the SIP Program accounts invested in accordance with their respective investment objectives, financial situation, and investment risk tolerance.

91.     As a result of CSIA's breaches described herein, Plaintiffs and the Class have suffered damages.

92.     Plaintiffs seek damages to redress their financial losses, and disgorgement of any undue gains.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment and Imposition of Constructive Trust

93.     Plaintiffs repeat and incorporate herein the allegations of paragraphs 1-92, inclusive.

94.     By engaging in self-dealing and inequitable conduct in connection with managing the "Intelligent Portfolios" investments of Plaintiffs and the proposed Class, CSIA and its corporate parent, Schwab, obtained payments from Plaintiffs and the proposed Class in the form of interest, charges and fees, expenses and costs.

95.     As a result of the relationship between the parties and the facts stated above, CSIA and its corporate parent, Schwab, have been and will be unjustly enriched if they are permitted to retain such funds and therefore a constructive trust should be established over the interest monies Plaintiffs paid in connection with their respective SIP Program accounts, including interest from the cash positions in the SIP Program accounts, charges and/or other fees, expenses and costs. These monies are traceable to CSIA and/or its corporate parent, Schwab, and/or firms utilized, operated and/or controlled by these entities.

96.     In the alternative to their at-law allegations, Plaintiffs allege that they have no adequate remedy at law and have been damaged in an amount to be determined at the trial of this action.

## SIXTH CAUSE OF ACTION

### For Breach of Covenant of Good Faith and Fair Dealing

97.     Plaintiffs repeat and incorporate herein the allegations of paragraphs 1-96, inclusive.

98.     CSIA has a common law duty of good faith and fair dealing with respect to investors in the SIP Program like Plaintiffs and the proposed Class here.

99.     CSIA violated the covenant of good faith and fair dealing by causing Plaintiffs and the proposed Class here to be invested in excessive and imprudently large cash positions in the SIP Program.

100.    By virtue of the wrongful conduct of CSIA, Plaintiffs and the members of the proposed Class have been directly and proximately injured in connection with their investments in the SIP Program.

101.    Plaintiffs seek damages to redress their financial losses, and disgorgement of any undue gains.

### **PRAYER**

WHEREFORE, Plaintiffs and the proposed Class pray for judgment against CSIA as follows:

A.      For a preliminary and permanent order of injunctive relief enjoining CSIA from pursuing the acts and practices complained of herein;

B.      Imposition of a constructive trust and an Order granting restitution, disgorgement of ill-gotten profits, and such other equitable relief as the Court deems just and proper;

C.      For actual damages according to proof;

D.      For reasonable attorneys' fees, costs and expenses of investigation and litigation;

E.      For costs of suit, pre-judgment, and post-judgment interest; and

F.      For such other and further relief as the Court may deem necessary or appropriate.

DATED: September 10, 2021                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                         _s/ John T. Jasnoch_
                                         JOHN T. JASNOCH (CA Bar No. 281605)
                                         jjasnoch@scott-scott.com
                                         600 W. Broadway, Suite 3300
                                         San Diego, CA 92101
                                         Telephone: 619-233-4565

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
GARRETT WOTKYNS (*pro hac vice* application forthcoming)
gwotkyns@scott-scott.com
8068 East Del Acero Drive
Scottsdale, AZ 85258
Telephone: 480-889-3514

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Tanya Korkhov (*pro hac vice* application forthcoming)
tkorkhov@scott-scott.com
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444

**PEIFFER WOLF CARR KANE & CONWAY LLP**
Joseph C. Peiffer (*pro hac vice* application forthcoming)
jpeiffer@peifferwolf.com
Daniel J. Carr (*pro hac vice* application forthcoming)
dcarr@peifferwolf.com
Kevin P. Conway (*pro hac vice* application forthcoming)
kconway@peifferwolf.com
Jamie L. Falgout (*pro hac vice* application forthcoming)
jfalgout@peifferwolf.com
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: 504-523-2434

*Counsel for Plaintiffs Lauren Marie Barbiero,*
*Kimberly Jo Lopez, and William Kenneth Lopez*

26